IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____x

JEFFREY GOE, derivatively on behalf of
SIRIUS XM RADIO, INC.,                              **Civil Action**

          Plaintiffs,                              **No. 1:11-cv-03506-HB**

Vs.                                                **ECF CASE**

JOAN L. AMBLE, LEON D. BLACK,
EDDY W. HARTENSTEIN, JAMES
P. HOLDEN, MEL KARMAZIN,                            **JURY TRIAL DEMANDED**
JACK SHAW, GREGORY B.
MAFFEI, JOHN C. MALONE,
DAVID J.A. FLOWERS,
VANESSA A. WITTMAN, and
CARL E. VOGEL,

          Defendants.

    --and--

SIRIUS XM RADIO, INC.

          Nominal Defendant.
_____x

## VERIFIED SHAREHOLDER'S DERIVATIVE COMPLAINT

Plaintiff, Jeffrey Goe ("Plaintiff") asserts this shareholder's derivative complaint on behalf of nominal defendant Sirius XM Radio, Inc. ("Sirius" or "the Company") based on the following allegations, which are made on information and belief, except as to matters personal to the Plaintiff, which are made on personal knowledge:

## OVERVIEW

1.     This is a shareholder derivative action brought by a long-time shareholder of Sirius XM Radio, Inc. ("Sirius" or "the Company") on behalf of the Company against certain of its officers and directors ("Director Defendants" or "Individual Defendants") seeking that the

Board of Directors of Sirius (the "Board") commence a derivative lawsuit against the current and former executive officers and directors of the Company as a result of wasting corporate assets to defendant and settle the antitrust lawsuit filed against the Company in the United States District Court, Southern District of New York Case No. 09-CV-10035 (HB) ("Federal Action").

2.      A derivative lawsuit will trigger individual insurance coverage which will benefit the Company.  There is no insurance policy that covers the Company for the alleged antitrust violations.  The settlement of the antitrust litigation should include monies from the Directors' and Officers' Insurance policies of Sirius XM Radio, Inc. and not just directly from the Company.

3.      Sirius is the surviving company of a merger completed on July 28, 2008 between Sirius Satellite Radio ("Sirius Satellite") and XM Satellite Radio ("XM Satellite"), the only two providers of mass market digital satellite radio services.  Because of the concentrated market for satellite radio services, the companies were required to obtain clearance for the merger from both the Department of Justice's Antitrust Division ("DOJ") and from the Federal Communications Commission ("FCC").

4.      On February 19, 2007, officers of both companies began paving the way for the antitrust approval by assuring Congress, federal agencies, and customers that the business combination would not result in price increases.

5.      On February 28, 2007, just nine days after the merger agreement was announced, Sirius Satellite's CEO, defendant Mel Karmazin, appeared before the Antitrust Task Force of the House Judiciary Committee, where he stated unequivocally that: "We are absolutely convinced

this merger will be in the best interest of consumers.  This merger will give consumers more choice *at a lower price* and more importantly, less confusion."  (Emphasis supplied.)

6.     The emphasis on the merger's ability to produce lower prices was important on several levels.  From a regulatory standpoint, enforcement officials were concerned that the merger would transform a duopoly into a monopoly, which brings with it the ability to set supracompetitive prices.  From a consumer's standpoint, the merger would be beneficial if it delivered a superior product at a lower price (or at least a steady price).  From a shareholder's standpoint, if the combined companies could deliver attractive content at reasonable prices the combined company would prosper.  Just as importantly, if the Company, post-merger, were to engage in large price hikes, this could subject it not only to consumer outrage, but to much more worrisome claims that the merger had indeed created a monopoly that was engaged in antitrust violations warranting an award of treble damages.  As Sirius has never been well-grounded financially, the last thing its officers and directors should have permitted post-merger was conduct that could result in a treble damage antitrust lawsuit.

7.     In order to assuage the concerns of shareholders, the customers and regulators, Sirius Satellite and XM Satellite engaged in a prolonged campaign to convince these parties that not only would they not raise rates post-merger, but that due to competitive restraints and market forces, they could not raise rates post-merger.

8.     In March 2007, defendant Karmazin testified before two more Congressional subcommittees, each time promising lower prices.  At a March 20, 2007 hearing, Karmazin stated: "[I]f in fact this merger happens, there will be lower prices and more choice for the consumer.  And therefore, that consumer will spend more time listening to satellite radio."

9.      As part of a scheme to woo shareholders and regulators, pre-merger Sirius and pre-merger XM engaged in a prolonged, planned-out campaign to convince these parties that not only would the newly formed company, Sirius, not raise subscription prices after the completion of the merger, but that due to competitive restraints, the new Company, post-merger could not do so.  These representations were knowingly false when made.

10.      On January 25, 2009, six months after the merger, Sirius announced that it would increase the monthly price charged to multi-receiver subscribers.  Effective March 11, 2009, Sirius increased the price $2.00 per radio: from $6.99 to $8.99, nearly a 30% increase.

11.      At the time this subscription increase was announced, approximately 20% of Sirius subscribers were multi-receiver subscribers.  Of its approximately 20 million subscribers, roughly 4.0 million have been subject to this 30% increase for each additional receiver used. Sirius is now earning approximately an additional $7.9 million per month, or nearly $90 million annually, through Defendants' breaches.

12.      An antitrust lawsuit was filed against Sirius, *Blessing v. Sirius XM Radio, Inc.*, Civ. No. 1:09-cv-10035-HB (S.D.N.Y.) (the "Federal Action").  Not long after the merger was effectuated, Sirius began raising prices, and imposing prices on previously free services.  In March 2009, subscribers who enjoyed free access to programming via the Internet were asked to pay $2.99 per month for this feature.  In addition, according to the Federal Action, large royalty charges were imposed, which were represented to be pass-throughs of music royalties paid by Sirius, but in reality were much larger than these underlying charges.

13.      The gist of the Federal Action is that the DOJ's determination that the merged company would not have monopoly power was erroneous, and should not be followed, and that Sirius is indeed a monopolist as evidenced by its apparent ability to sustain profitable price

increases, which exceed the 5 per cent rule of thumb applied as a measurement of monopoly power.

14.     The Company's promises and representations as to price expectations and post-merger pricing power (or the lack thereof) were made publicly over many months and were known to the members of the Board of Directors of each constituent company, and to the vast majority of present Sirius directors, as ten of such directors (out of thirteen total) served as directors of one or the other of the constituent companies prior to the merger.  The recent price increases represent conduct the Company promised that it would not, and could not, engage in post-merger.  The price increases and newly imposed charges were done openly and notoriously, were made a core part of Sirius's business plan, and were known to all members of the Board of Directors.

15.     The Federal Action was hard fought litigation between the parties involving motion practice, document review and preparation for trial.

16.     The Federal Action was recently settled.   On May 13, 2011, Plaintiff filed a Motion to Preliminarily Approve the Proposed Settlement with the Court.   The terms of the settlement are the following:

a.  The base prices for monthly, quarterly, semi-annual, annual and other long term subscriptions (but excluding lifetime subscriptions) will remain at or below their current rates through December 31, 2011.

b.  The price for subscriptions (beyond the initial subscription) purchased by multi-radio subscribers will remain at or below the current rate through December 31, 2011.

c.  The price for Internet streaming for subscribers with basic subscriptions will remain at or below $2.99 per month through December 31, 2011.

d.  Defendant will not increase the subscription prices for its "Best of" packages (now known as "premier" packages) prior to December 31, 2011.

e.  The U.S. Music Royalty Fee will remain at or below its current rate through December 31, 2011.

f.  Subscribers will, irrespective of whether their subscription plans come up for renewal prior to December 31, 2011, be permitted to renew their subscriptions prior to December 31, 2011 at the rates currently in effect and be able to subscribe, at the rates existing through December 31, 2011, to a monthly, quarterly, semi-annual, annual or other then-existing long term subscription plans (but excluding lifetime subscriptions) which will keep their rates at then-existing subscription levels through the entire period of their new subscription term.

g.  Defendant will permit former subscribers who terminated their Sirius XM service between July 29, 2009 and the deadline for requesting exclusion from the Class to either (a) reconnect their satellite radio without paying a reactivation fee and receive one month of basic satellite radio service as no cost; or (b) receive Sirius XM Internet streaming service for one month at no cost.

In addition, Class Counsel will be receiving $13 million for reimbursement of expenses and legal fees.

17.   This settlement will cost the Company approximately $200 million not including the cost of defense based on class counsel's argument that the benefit to the class is $180 million coupled with the $13 million legal fee.

18.   The purpose of this derivative lawsuit is to have applicable D&O insurance coverage for the Board to help offset some of the approximately $200 million settlement costs.

## JURISDICTION AND VENUE

19.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship jurisdiction) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the Plaintiff is a citizen of New Jersey and each defendant is a citizen of a state other than New Jersey. This action is not brought collusively to confer jurisdiction on this Court that it otherwise would lack.

20.     This action is also brought pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because the factual allegations, and the law and issues to be resolved are so intertwined with the federal antitrust laws and the antitrust litigation pending against Sirius that this case must properly heard in federal court where such issues of federal law may be appropriately decided.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. 1367 (supplemental jurisdiction) in that this action is pendant or ancillary to the Federal Action, as the issues are so interrelated.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Sirius has it executive offices in this District and because acts and offenses pertinent to the causes of action stated herein were committed in this district.

## THE PARTIES

22.     Plaintiff Jeffrey Goe is a Sirius shareholder who currently holds shares of Sirius stock and has continuously held Sirius shares since before the merger had closed until the present.  Goe is a citizen of New Jersey.

23.     Nominal defendant Sirius is a Delaware corporation with its principal executive offices located at 1221 Avenue of the Americas, 36th Floor, New York, NY 10020.  The Company's stock is traded on NASDAQ under the symbol "SIRI."

24.     Defendant Joan L. Amble ("Amble") has been a director since July 2008.  From December 2006 until the closing of the merger with XM in July 2008, Ms. Amble served as a director of XM Satellite.  Amble is a citizen of Connecticut.

25.     Defendant Leon D. Black ("Black") has been a Sirius director since June 2001. Black is a citizen of New York.

26.    Defendant Eddy W. Hartenstein ("Hartenstein") has been a director since July 2008.  From May 2005 until the closing of the merger with XM Satellite in July 2008, Hartenstein served as a director of XM Satellite.  Currently, Hartenstein is the Chairman of Board of Directors.  Hartenstein is a citizen of California.

27.    Defendant James P. Holden ("Holden") has been a director of Sirius since August 2001.  Holden is a citizen of Michigan.

28.    Defendant Mel Karmazin ("Karmazin") serves as Sirius Chief Executive Officer and as a member of its board of directors since November 2004.  Karmazin is a citizen of New York.

29.    Defendant Jack Shaw ("Shaw") has been a Sirius director since July 2008.  From May 1997 until the closing of the merger with XM Satellite in July 2008, Mr. Shaw served as a director of XM Satellite.  Shaw is a citizen of Michigan.

30.    Defendant Gregory B. Maffei ("Maffei") has been a Sirius director since March 2009.  Maffei sits in the Board as one of three directors designated by holders of Sirius's Series B-1 Preferred Stock.  Maffei is a citizen of Colorado.

31.    Defendant John C. Malone ("Malone") has been a Sirius director since March 2009.  Malone sits in the Board as one of three directors designated by holders of Sirius's Series B-1 Preferred Stock.  Malone is a citizen of Colorado.

32.    Defendant David J.A. Flowers ("Flowers") has been a Sirius director since March 2009.  Flowers sits in the Board as one of three directors designated by holders of Sirius's Series B-1 Preferred Stock.  Flowers is a citizen of Colorado.

33.     Defendant Vanessa A. Wittman is a Sirius director and has been since April 2011. Wittman sits on the Board as one of five directors designated by the Malone Group.  Wittman is a citizen of Utah.

34.     Defendant Carl E. Vogel is a Sirius director and has been since April 2011. Vogel is a citizen of Colorado.

## FACTUAL ALLEGATIONS

35.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the individual Defendants owed the Company and shareholders fiduciary obligations of good faith, trust, loyalty and due care and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The individual Defendants were and are required to act in furtherance of the best interest of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets and highest obligations of fair dealing.

36.     The Director Defendants constitute a controlling vote of the Board of Directors of Sirius at the times relevant herein.  Each of the Director Defendants was the agent of each and every other director and of Sirius with regard to all events and actions described herein and was acting within the course and scope of such agency at all relevant times.

## SUBSTANTIVE ALLEGATIONS

37.     On February 19, 2007, Sirius Satellite and XM Satellite entered a Merger Agreement providing for the conversion of XM stock into a right to receive stock of Sirius.  The proposed merger could not close until both the DOJ and the FCC had signed off on the deal.

38.     On March 13, 2007, Sirius and XM filed its pre-merger notification with the DOJ, which gave federal antitrust regulators 30 days to review the merger before its consummation. On April 12, 2007, Sirius and XM received a request for additional information from the DOJ, which extended the waiting period during which the deal could not close.  The companies completed their additional submission in early September 2007.

39.     On March 24, 2008, the DOJ announced its decision to close its investigation into the proposed transaction.

40.     The DOJ closed its investigation based on two assumptions: (1) that the combined company, Sirius XM, would not be able to "profitably sustain an increased price to satellite radio consumers," and (2) that efficiencies from the merger would "be passed on to consumers in the form of lower prices."  According to the Federal Complaint, since the merger, the conduct of Sirius has proven that the DOJ's determinations were wrong.

41.     The findings of determination of the DOJ are given weight in subsequent court proceedings under the antitrust laws, but are not conclusive as to the issues raised, such as the relevant market and whether a particular market participant is a monopolist.

42.     Due to the proposed merger involved the transfer of control of FCC licenses, Section 310(d) of the Communications Act of 1934 mandated that an application be made to the FCC for authority to transfer control.  47 U.S.C. § 310(d).  The FCC was prohibited, under Section 310(d), from approving the transfer of control – and hence the merger – unless the

Agency found that the transfer would serve the public interest, convenience, and necessity.  47 U.S.C. § 310.

43.     Sirius and XM filed a joint application to the FCC for approval of the transfer and merger on March 20, 2007.

44.     In connection with its license transfer Application, Sirius and XM provided the sworn statement of David Frear, presently the Executive Vice President and Chief Financial Officer of Sirius:

> Prior to the announcement of this merger and immediately thereafter, securities analysts estimated that there would be efficiencies from the merger of Sirius and XM Satellite Radio ("XM") on the order of hundreds of millions of dollars annually… Sirius' management independently considered the potential for synergies and cost savings from a merger with XM and also believe that there would be hundreds of millions of dollars in annual efficiencies.

45.     The transfer Application predicted that "[t]he synergies resulting from the merger will allow the combined company to provide consumers lower prices and more programming choices."  Application at 9 (emphasis added).

46.     Sirius XM pledged that "no satellite radio subscriber will have to pay more… as a result of the merger." FCC Memorandum and Order (hereafter "FCC Order" or the "Order" (at 11-12 (July 25, 2008); see also Sirius XM's Joint Opposition to Petitions to Deny and Comments at 13 (FCC filing July 24, 2007).

47.     Sirius and XM committed to the FCC that if the merger/transfer of licenses was approved, the combined company would not raise prices:

> The combined company will not raise the retail price for its basic $12.95 per month subscription package, the a la carte programming packages… and the new programming packages… for thirty six months after consummation of the merger[1].

---

[1] FCC Order at 88 (Appendix B, Applicants Voluntary Commitments submissions, June 13, 2008 letter); see also July 25, 2008 letter at 2.

48.     Sirius XM also promised that "[s]ubscribers will also be able to continue their $6.99 multi-receiver subscriptions."  Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 14 (FCC filing July 24, 2007).  Sirius XM committed to the above pricing restrictions in order to persuade the FCC and the public that the Sirius XM merger would not create a monopoly, lessen competition, or result in increased prices.

49.     Before the merger, Sirius and XM offered multi-receiver subscription discounts that permitted subscribers to pay a reduced fee of $6.99 per month for each additional radio (for up to five total radios), rather than paying the full $12.95.

50.     In its efforts to persuade the FCC to approve the Application, Sirius XM promised not to increase the multi-receiver subscription prices above this level.  Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 13 (FCC filing July 24, 2007).

51.     On January 25, 2009, just six months after the merger was approved, Sirius XM announced that it would increase the monthly price charged to multi-receiver subscribers. Effective March 11, 2009, Sirius XM increased the price by $2.00 per radio: form $6.99 to $8.99 per radio, a 29% increase.

52.     Approximately 20% of Sirius XM subscribers are multi-receiver subscribers.  Of its approximately 18.5 million subscribers, roughly 3.8 million have therefore been subject to this 29% increase for each additional receiver used.  Sirius XM is now earning approximately an additional $7.4 million per month (assuming the multi-receiver subscribers have one additional receiver and pay on a monthly basis), or nearly $89 million annually.

53.     Also effective March 11, 2009, Sirius XM began charging $2.99 for all subscribers accessing Sirius or XM programming via the internet.  Prior to this time, this fee was only applicable for users accessing the programming via the high-quality 132 bkps connection.

Sirius and XM users accessing the programming through the lower-quality 32 bkps or 64 bkps connections could do so for free.  Sirius XM also publicly attributed its increased revenue to this new fee.

54.      In evaluating a proposed merger, the DOJ and Federal Trade Commission use guidelines for defining the relevant market, and determining whether the proposed merger would threaten competition by giving the merged entity a significant concentration in the relevant market.  In these guidelines, the relevant market is defined as the narrowest group of products that would allow a hypothetical monopolist to profitably impose a "small-but-significant-and-nontransitory-increase-in-price" ("SSNIP"), which is generally a five percent increase.  As detailed below, Sirius XM had imposed significant-and-nontransitory-increases-in-prices over the past year, thus providing support for the allegations in the Federal Action that it is a monopolist.

55.      Sirius XM's quarterly report for the period ending September 30, 2009 stated:

> The increase in revenue was due mainly to increased rates on multi-subscription packages, revenues earned on internet packages, the introduction of the U.S. Music Royalty Fee and the sale of "Best of" programming.

Q2 2009 Form 10-Q at 39 (emphasis added).

56.      Thus, there is no doubt that Sirius's pre-merger statements and its post-merger practices were known to its Directors.  Plaintiff does not allege that the companies' statements pre-merger were untrue, or that the companies' misstated their intentions.  Rather, Plaintiff asserts that, to the extent Sirius has, post-merger, exercised unlawful monopoly power and engaged in improper practices, the defendants herein (having directed or permitted such open misconduct) must account for any damages the Company may suffer.  In addition, the directors must account to Sirius for any other damages that the Company may suffer as a result of the non-

antitrust harms asserted in the Federal Action, including violation of various state consumer protection laws.

57.    The Federal Action which is an antitrust lawsuit was filed against the Company on December 7, 2009.

58.    The operative complaint in that action is the Second Amended Complaint, which was filed on May 3, 2010.  It names Sirius as the only defendant.  After an early round of motion practice, Defendants eventually caused Sirius to move for summary judgment dismissing the claims.  The plaintiffs, for their part, moved for class certification.

59.    On March 29, 2011, this Court (Baer, J.) granted class certification as to the antitrust claims, and denied Sirius' motion for summary judgment on the antitrust claims (while granting it with respect to certain state law claims).  Judge Baer certified the following class:

> All persons or entities who reside in the United States and who contracted with Sirius Satellite Radio, Inc., XM Satellite Radio Holdings, Inc., Sirius XM Radio, Inc. or their affiliated entities for the provision of satellite digital audio radio services who, during the relevant period of July 29, 2008 through the present: (1) paid the U.S. Music Royalty Fee; (2) own and activated additional radios ("multi-radio subscribers") and paid the increased monthly charge of $8.99 per additional radio; or (3) did not pay to access the content available on the 32 [kbps] or 64 [kbps] connections on the Internet but are now paying the Internet access monthly charge of $2.99.

60.    The Federal Action includes factual claims regarding the Music Royalty Fee, the price increase from $6.99 to $8.99 on multiple subscriptions, and the Internet access charge.  It will proceed under both Section 2 of the Sherman Antitrust Act and Section 7 of the Clayton Antitrust Act.

61.    Plaintiffs have reached agreement with Defendant Sirius XM Radio Inc. ("Sirius XM") to settle the antitrust lawsuit through a combination of provisions that collectively are estimated to provide a benefit to Class Members of approximately $180 million.  These benefits are as follows:

a. The base prices for monthly, quarterly, semi-annual, annual and other long term subscriptions (but excluding lifetime subscriptions) will remain at or below their current rates through December 31, 2011.

b. The price for subscriptions (beyond the initial subscription) purchased by multi-radio subscribers will remain at or below the current rate through December 31, 2011.

c. The price for Internet streaming for subscribers with basic subscriptions will remain at or below $2.99 per month through December 31, 2011.

d. Defendant will not increase the subscription prices for its "Best of" packages (now known as "premier" packages) prior to December 31, 2011.

e. The U.S. Music Royalty Fee will remain at or below its current rate through December 31, 2011.

f. Subscribers will, irrespective of whether their subscription plans come up for renewal prior to December 31, 2011, be permitted to renew their subscriptions prior to December 31, 2011 at the rates currently in effect and be able to subscribe, at the rates existing through December 31, 2011, to a monthly, quarterly, semi-annual, annual or other then-existing long term subscription plans (but excluding lifetime subscriptions) which will keep their rates at then-existing subscription levels through the entire period of their new subscription term.

g. Defendant will permit former subscribers who terminated their Sirius XM service between July 29, 2009 and the deadline for requesting exclusion from the Class to either (a) reconnect their satellite radio without paying a reactivation fee and receive one month of basic satellite radio service as no cost; or (b) receive Sirius XM Internet streaming service for one month at no cost.

62.     Arm's-length settlement negotiations have taken place between Class Counsel and Defendant's Counsel over a lengthy period of time, and this Agreement, which embodies all of the terms and conditions of the settlement ("Settlement") between defendant and Plaintiffs, both individually and on behalf of the Class, has been reached, subject to final approval of the United States District Court for the Southern District of New York.

63.     Class Counsel have concluded, after extensive discovery, motion practice, and trial preparation, and after carefully considering all of the circumstances of this action, that it would be in the best interests of the Class to enter into this Agreement in order to avoid the

uncertainties of, and delays associated with the outcome of, the trial and any subsequent appeals, and to assure a benefit to the Class and, further, that Class Counsel consider the Settlement to be fair, reasonable, and adequate and in the best interests of the Class.

64.     Defendant has concluded, despite its belief that it is not liable for the claims asserted in this action and that it has good defenses thereto, that it is in the best interests to enter into this Agreement to avoid further expense, inconvenience, and the distraction and uncertainty of burdensome and protracted litigation and thereby to resolve this controversy.

65.     Plaintiff's attorneys' fees and expenses will not come out of these benefits but rather will be separately paid by Defendant, subject to the Court's approval, in an amount up to $13 million, plus interest.   In addition, Defendant will provide notice to the Class of this Settlement as directed by the Court, and pay all costs associated with notice of this Settlement, and any other costs associated with administration of the Settlement notice.

### PRE-SUIT DEMAND WAS WRONGFULLY REJECTED AS TO THE REQUEST THAT THE BOARD COMMENCE A DERIVATIVE ACTION

**A.     Plaintiff Duly Makes a Pre-Suit Demand and the Board Rejected It, Providing No Response to the Demand**

66.     On February 25, 2011, Plaintiff through counsel served the Demand on the Board seeking to require, inter alia, that the Board commence a Derivative Lawsuit against themselves and recover for the benefit of the company.  (See a true and correct copy of the Demand letter attached hereto as "Exhibit A").

67.     The February 25, 2011 Demand letter sent to Eddy W. Hartenstein, Chairman of the Board via FedEx and received on Monday, February 28, 2011.  (See FedEx confirmation of delivery attached hereto as "Exhibit B").

68.     The aforementioned Demand letter pointed out the fact that the antitrust lawsuit was not concluded is no bar to a derivative lawsuit. Further, the letter explained to Mr. Hartenstein that there was no applicable insurance policy that covers the Company for the alleged antitrust violations. The potential settlement of that lawsuit should include monies from the Directors and Officers Insurance policies of Sirius XM Radio, Inc. and not just directly from the company.

69.     Mr. Hartenstein and the Board failed to respond to the Demand letter in any way whatsoever.   The purpose of the letter was to advise the Board to take action before the settlement took place so the Company would have the D&O insurance policy contributing money to the settlement.

70.     Plaintiff maintains that failing to respond to the Demand constitutes a refusal of the Demand.

**B.     The Demand Was Wrongfully Refused**

71.     The Board's refusal to take action and reject the pre-suit demand is not a product of rational business judgment.  The serious allegations that the Company's management in the alleged antitrust allegations coupled with the settlement of the Federal Action supports a conclusion that the Board's decision was a cover-up rather than a fair and impartial investigation. Moreover, the decision seems to be motivated by a substantial fear of personal liability. Nonetheless, the Board exhibited a brazen and incompliant attitude that has cost the Company a significant amount of money.  The actions of the Director Defendants served to waste corporate assets.

## COUNT I

## <u>AGAINST DIRECTOR DEFENDANTS FOR BREACH OF FIDUCIARY DUTY</u>

72.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

73.     As alleged in detail herein, Director Defendants had a duty to conduct themselves in a diligent, honest and prudent manner and exercise good faith and diligence in maintaining their image and reputation, which are essential in the Company's business.

74.     Director Defendants breached their fiduciary duties by engaging in the misleading of the public by making inaccurate and/or untrue statements regarding their intended conduct, all of which is served to destroy the reputation and credibility of Sirius.

75.     As a direct and proximate result of Director Defendants' foregoing breaches of fiduciary duties, Sirius has suffered damages, including, but not limited to costs incurred in the settlement of the Federal Action and attorneys' fees.

## COUNT II

## <u>DERIVATELY AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT</u>

76.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

77.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Sirius.  While these Defendants received millions of dollars in salary, fees, stock and options awards, and other largesse, the Company's market-capitalization was eviscerated.

78.     Plaintiff, as a shareholder and representative of Sirius, seeks restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and

other compensation obtained by all of these Defendants, and each one of them, from their wrongful conduct and fiduciary breaches.

## COUNT III

## WASTE OF CORPORATE ASSETS

79.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

80.     In causing the company to pay approximately $200 million to settle the Federal Action, the Director Defendants committed a wanton and reckless waste of Sirius's corporate assets.

81.     The Director Defendants are responsible for such waste and should be held accountable to and repay the Company therefore.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.     Declaring that each of the Director Defendants has breached his or her fiduciary and other duties owed to Sirius and its shareholders as alleged herein;

B.     Directing the Director Defendants, jointly and severally, to account for all losses and damages sustained by Sirius caused by reason of the acts and omissions complained of herein;

C.     Awarding Sirius money damages against all Director Defendants, jointly and severally, for all losses and damages sustained and to be sustained by Sirius and its shareholders as a result of the acts, omissions and transactions complained of herein;

D.     Directing the Director Defendants to account for and to remit and disgorge to Sirius all profits and other benefits and unjust enrichment they have obtained and retained

(together with their earnings thereupon) as a result of the acts and omissions complained of herein, including all salaries, bonuses, fees, stock awards, options, compensation and common stock sales proceeds together with the earnings upon such amounts by which such defendants were unjustly enriched and imposing a constructive trust thereon as well as the earnings such defendants have received thereupon;

E.     Ordering that the present members of the Sirius Board of Directors and senior management of Sirius and those under their supervision and control refrain from further misconduct as alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

F.     Ordering the Company to take all necessary actions to reform and improve their corporate governance and internal control procedures including, *inter alia*, (1) establishing and implementing effective governance standards, and (2) implementing an effective risk management system that will (a) adequately identify the material risks that the Company and Sirius face in a timely manner, (b) implement appropriate risk management strategies that are responsive to the risk profiles and specific material risk exposures of Sirius, (c) integrate consideration of risk and risk management into business decision-making throughout Sirius, and (d) include policies and procedures that adequately transmit necessary information to senior executives and, as appropriate, to the Boards of Directors or relevant Committees;

G.     Ordering the individual defendants to surrender to the Company all compensation or other benefits paid or arguably payable by Sirius that were based upon or otherwise tied to its financial statements that were materially false;

H.     Awarding Sirius prejudgment and post-judgment interests as allowed by law;

I.     Awarding Sirius punitive damages;

J.      Awarding plaintiff's attorneys' fees, expert fees, consultant fees and other costs and expenses; and

K.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Dated: May 19, 2011                          **SOHMER & STARK, LLC**


                              By:      /s/ Stephen M. Sohmer
                                       Stephen M. Sohmer, Esq. (I.D. No. SS5127 )
                                       Amir M. Stark, Esq. (*pro hac vice* application to be filed)
                                       Sohmer & Stark, LLC
                                       1018 Broad Street, Suite 101
                                       Bloomfield, NJ 07003
                                       Telephone: 973-337-6894
                                       Email: ssohmer@sohmerstark.com
                                       Email: astark@sohmerstark.com

                                       Brian M. Felgoise, Esq. (*pro hac vice* application to be filed)
                                       Felgoise Law Firm
                                       261 Old York Road, Suite 518
                                       Jenkintown, PA 19046
                                       Telephone: 215-886-1900
                                       Email: felgoiselaw@verizon.net